*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CF-0191

MARQUETTE M. JORDAN, APPELLANT

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CF1-006586)

(Rainey R. Brandt, *Judge*)

(Argued February 24, 2026                    Decided August 13, 2026)

*Jason K. Clark* for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Natalie Hynum*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge*.

DEAHL, *Associate Judge*: Marquette Jordan was convicted of second-degree murder and two related counts stemming from the stabbing and death of Ivan Lynch. Jordan now appeals his convictions. He argues that, on the sixth day of jury

deliberations, the trial court improperly dismissed a deliberating juror who appeared to be a holdout for acquittal.

More specifically, on that sixth day of deliberations, a juror sent a note to the trial court expressing frustration with a fellow juror's "lack of willingness to participate in juror responsibilities and refusal to accept the court's structure." Later that day, a different juror sent a note claiming that a "specific juror misunderstands the fundamental responsibilities of being a juror in a criminal* trial," opining that this specific juror was "not comfortable making judgements against others." The trial court spoke with the juror in question—Juror 15—who stated that he had been participating in deliberations but confirmed that he had not initially understood that the jurors had to reach a unanimous agreement. When asked if he could continue deliberating, Juror 15 responded, "I'm going to say no" because "I get my own little idea that I hold onto and I think I'm going to hold onto it." The government moved to dismiss Juror 15, arguing that he could not fulfill his duty to deliberate, while defense counsel argued that the court could not dismiss Juror 15 because his reluctance to continue seemed to stem from his dissenting views about the case. The trial court concluded that, because Juror 15 was "unequivocal" that he could not "continue or resume deliberations," he was "unavailable under the rules" and thus had to be dismissed. An alternate juror took Juror 15's place, and Jordan was convicted of all counts after one day of deliberations.

Jordan now appeals, arguing that the trial court erred in dismissing Juror 15 because there was a reasonable possibility that his dismissal stemmed from his views about the merits of the case. We agree. Our precedents instruct that "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Shotikare v. United States*, 779 A.2d 335, 345 (D.C. 2001) (quoting *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999)). Two considerations lead us to conclude that there was such a reasonable possibility here. First, no extrinsic circumstance unrelated to the deliberations, such as illness or abusive conduct, animated Juror 15's dismissal. Second, the two jurors who complained about Juror 15 did so only on the sixth day of deliberations, rather than at the outset, so it appeared that Juror 15 had indeed actively deliberated in the case and it was the substance of those deliberations that led him to disengage. His own explanation for not wanting to deliberate further supports that conclusion: in his words, he had his "own little idea that" he was "going to hold onto," suggesting that he had made up his mind and viewed further deliberations as futile. Because the record leaves open a reasonable possibility that Juror 15's dismissal stemmed from his views on the merits of the case, and since removing "a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict,"

*Shotikare*, 779 A.2d at 344 (quoting *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir. 1997)), we reverse Jordan's convictions and remand for a new trial.

## I. Background

In April 2018, a group of friends that included Jordan and Ivan Lynch gathered for a party. Jordan and Lynch got into a fight during the party and Lynch was stabbed in the heart and died. The other attendees offered somewhat different accounts of what happened, but two of them testified that Jordan picked up a butcher knife and stabbed Lynch before fleeing the apartment. Jordan's principal defense was that another of the party's attendees committed the murder, that yet another attendee helped her cover it up, and that their friends were covering for them by falsely implicating Jordan. Jordan was stopped shortly after the stabbing by police officers who found him walking with Lynch's car keys in his pocket. The officers found Lynch's phone in the area as well, but never recovered a knife or any other weapon.

The government charged Jordan with, among other things, one count of first-degree murder while armed, one count of robbery while armed, one count of simple assault, and one count of carrying a dangerous weapon (CDW). After a lengthy first trial, the jury deliberated for three days and reached a partial verdict, acquitting Jordan of robbery while armed. The jury then deliberated for two more days and acquitted Jordan of first-degree murder but could not reach a verdict on the lesser-

included offense of second-degree murder, CDW, or simple assault, so the court declared a mistrial.

The government then re-tried Jordan for the three surviving charges, and this appeal arises from that second trial. The additional facts relevant to this appeal all relate to this second jury's deliberations, so we now turn to those.

*Juror 15 asks to be removed on day five of deliberations*

The first four days of jury deliberations were relatively uneventful so far as the record reveals, with the caveat that we know little about what went on in the jury room given the general secrecy of deliberations. The jury sent a handful of notes asking to see some exhibits, for some technical assistance with court machinery, and the like.

On the morning of the fifth day, the jurors sent two notes of some relevance here. The first note asked: "In order to consider manslaughter, does the jury first need to determine, unanimously, that [Jordan] is not guilty of second-degree murder?," suggesting that the jurors had reached some impasse on the lead charge. The second note contained a request from Juror 15 "to be removed due to financial reasons." The trial judge answered yes to the first note and told Juror 15 she would speak to him later in the day about the second note.

That afternoon, the trial judge interviewed Juror 15 about his request to be removed. Although Juror 15 was retired and had not raised any issue with his finances before, he explained that continuing jury service would keep him from working ad-hoc jobs that he needed to pay his mortgage. When the trial judge suggested half-day deliberations as an accommodation, Juror 15 was skeptical but said "we can try it" and was sent back to resume deliberations. After this exchange, the judge opined that "this job thing is a total ruse" because Juror 15's answers were "cagey" and he seemed like he "wants to get off the jury." Neither party sought to remove Juror 15 at that point.

### *The jury reports concerning Juror 15 on day six of deliberations*

The jury returned the next morning for a sixth day of deliberations. Shortly after they began deliberating that morning, Juror 28 sent the following note to the court:

> I am fearful that our jury could be held in contempt of court due to one juror showing a clear lack of willingness to <u>participate</u> in juror responsibilities and refusal to accept the court's structure. I feel that it was the juror's responsibility to disclose that when we were all questioned/asked to perform our duties at the start of this trial. This has <u>nothing</u> to do with [the] verdict, but the disregard for the system itself.

The trial judge conferred with counsel and noted that it was odd to hear of a juror "refusing to participate" at this stage of deliberations. She then decided to interview Juror 28.

After warning Juror 28 not to reveal the substance of deliberations, the trial judge asked her to clarify her note. Juror 28 said her issue was with Juror 15,[1] and it stemmed from his "willingness to participate in conversation, period." She then described Juror 15's attitude as "just 'I won't participate, I can't do this. . . . I'm not going to do this.'" The trial judge asked if "I won't participate" was a direct quote from Juror 15, but Juror 28 could only recall him saying: "I can't make a decision. Period." The judge then asked whether Juror 15 was engaged in deliberations, and Juror 28 said he was "not always" engaged and had sometimes played on his phone during the past "couple days" of deliberations. She also noted that other jurors had "expressed frustration both to me and all of us are sitting at the same table, so it's pretty evident how people are feeling." The trial court told Juror 28 not to discuss the matter with her fellow jurors and indicated that "we will get back to you," and deliberations then resumed.

---

[1] To be precise, Juror 28 did not identify Juror 15 until some minutes later in the colloquy when the judge asked her to identify him. For the narrative's sake, it helps to identify Juror 15 up front as the subject of the note and colloquy.

About half an hour later, before the court responded further, Juror 13 sent a note to the court:

> Good day to you! A specific juror misunderstands the fundamental responsibilities of being a juror in a criminal* trial. This juror throughout the process thought they were part of a majority decision (like in civil juries), and didn't think s/he was obligating themselves to an unanimous decision process. Now understanding that this role is part of a unanimous decision has created averseness to participating in the process due to emotional duress & perceived burden of an unanimous decision. This juror has made it clear that they are not comfortable making judgements against others & being part of this process.
>
> We believe the misunderstanding of the process of this individual from the start is why this person wasn't parsed out during voir dire. We have asked for the original 12 juror questions so that we can more thoroughly help this juror understand what should have been communicated from the start of this process. It is unfair to this juror [and] the greater process that s/he hadn't had the correct understanding for the past 4 weeks until now.

The parties discussed Juror 13's note, which everyone understood to be about Juror 15. Because it mentioned what appeared to be his unwillingness to sign onto a unanimous verdict, defense counsel argued it was unclear whether Juror 15 had "a closed mind or a dissenting mind" and added, "if it is a dissenting mind, then according to case law he may not be excused." The trial judge decided to interview Juror 15 again, recognizing the "very fine line" between permissible reasons to dismiss a juror and impermissible reasons, like having "an opinion that's different from his colleagues."

*Juror 15 is questioned and removed*

After warning Juror 15 not to reveal the substance of deliberations, the trial judge asked if he understood the final jury instructions, and he said "[n]o" because he had not originally understood "that we all have to come to the same agreement." The trial judge also asked Juror 15 if he had been "an active participant in the deliberations" to date, and he answered with an unequivocal "Yes." Then, when the judge asked Juror 15 how his new knowledge of the unanimity requirement affected his ability to deliberate, they had the following exchange:

> **The Court**: [H]as the issue that you didn't understand the jury instructions made it hard for you to deliberate up to this point?
>
> **Juror 15**: I would say yes.
>
> **The Court**: Okay. So—but now that you understand that the jury has to reach a unanimous verdict, are you able to continue with your deliberations?
>
> **Juror 15**: I'm going to say no.
>
> **The Court**: Why?
>
> **Juror 15**: I have—I get my own little idea that I hold onto and I think I'm going to hold onto it.
>
> **The Court**: I'm not sure what you mean by that. Can you explain it without—without telling—
>
> **Juror 15**: You know—

> **The Court:** Hold on. Can you explain it without telling us what you and your fellow jurors are talking about?
>
> **Juror 15**: That's kind of hard to do. It's—I don't know how to state this.

The judge stopped Juror 15 before he could say more.

The parties then discussed the matter outside of Juror 15's presence. Defense counsel emphasized that his ambiguous response suggested he may have stopped deliberating because he had reached a decision at odds with his fellow jurors' views and that "everybody else is picking on him because they're getting pissed off." Defense counsel suggested the trial judge ask Juror 15 if he could "continue deliberations without sacrificing [his] individual judgment." The government opposed that inquiry and requested instead that the judge ask Juror 15 if he had "an issue passing judgment and [with] the process as a whole." The judge remarked that Juror 15 had "essentially answered" that question already, then reviewed Juror 13's note again and said: "It's clear from that juror note that whatever the problem is here, he's not participating in the process. That is completely different from having made your mind up some way and . . . the majority is going this way and you're going this way." The judge also opined that Juror 15's purported misunderstanding of the unanimity requirement was mere "gamesmanship" and that Juror 15 "couldn't get it his way with the financial issue so now he's back claiming that he didn't understand" the unanimity requirement.

The trial judge resumed interviewing Juror 15 and asked, as the government suggested, if he had "any issue passing judgment." He replied: "Yes, I do." The judge then asked if his "financial situation affected [his] ability to deliberate," and Juror 15 said "[n]o." The judge asked one final question: "[A]re you telling us that the fact that you can't pass judgment is affecting your ability to deliberate?" Juror 15 replied, "I would say yeah." Once again outside Juror 15's presence, the government argued that Juror 15 should be removed because "he cannot deliberate and reach a judgment." Defense counsel countered that Juror 15 had been actively participating in deliberations and seemed to have simply "reached his decision."

The trial judge ultimately dismissed Juror 15. After discussing Juror 15's "perceived lack of participation" in deliberations, the trial judge remarked that he was "asked in two different ways whether or not now that he understands the responsibility of the jury to reach a unanimous verdict . . . could he continue or resume deliberations, and . . . his unequivocal answer was no." The judge concluded that "him not being able to continue to deliberate makes him unavailable under the rules. And I've got no choice but to remove him from this jury." Juror 15 was replaced with an alternate, and the reconstituted jury deliberated for roughly one day before returning a guilty verdict on all counts. Jordan now appeals his convictions.

## II. Analysis

The dispositive issue in this appeal is whether the trial court abused its discretion when it removed Juror 15 from the jury six days into deliberations. *See Israel v. United States*, 109 A.3d 594, 612 (D.C. 2014) (reviewing juror dismissal decisions for abuse of discretion). The parties agree, and our caselaw is clear, that the controlling standard prohibits a trial court from dismissing a deliberating juror "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case." *Shotikare v. United States*, 779 A.2d 335, 345 (D.C. 2001) (quoting *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999)).

Jordan argues that the trial court did not faithfully apply the *Shotikare* standard and that there is a reasonable possibility on this record that Juror 15's "unwillingness" to deliberate further stemmed from his entrenched views favoring acquittal, and that he viewed further deliberations as futile. The government counters that Juror 15's refusal to participate in deliberations had nothing to do with his view on the merits and amounted to misconduct that justified his dismissal. We agree with Jordan that, based on this record, there was a very real possibility that the impetus for Juror 15's dismissal was that he had entrenched views about the merits of the case that differed from his fellow jurors' views.

Before diving into the facts of this case, in Part II.A we discuss the *Shotikare* standard and the principles and precedents underlying it. These cases are quite stringent about when a trial court can dismiss a deliberating juror, but we have since described at least two situations where a juror can be removed without unduly intruding into the jury's deliberations while still preserving the defendant's right to a unanimous verdict. They are, as we will discuss in Part II.B: (1) if an extrinsic circumstance separate from the substance of the deliberations animates the juror's dismissal; and (2) if a juror refused to participate or had a closed mind from the outset of deliberations. Outside of those two scenarios, our precedents have never approved of a mid-deliberation removal of a juror from a criminal trial. That is no doubt because it is hard to be firmly convinced that the impetus for a juror's dismissal is unrelated to their view on the merits outside of those scenarios. While we do not foreclose that some third scenario might exist, we explain in Part II.C why this case does not present such a scenario. When a juror stops deliberating several days into deliberations, the court must be especially attuned to the reasonable possibility that their views on the merits animated their disengagement, and there are strong clues in this record that was the case here.

*A. The* Shotikare *standard and the cases that animated it*

In *Shotikare*, we adopted the standard that a deliberating juror cannot be dismissed "if the record evidence discloses any *reasonable* possibility that the impetus for [their] dismissal stems from the juror's views on the merits of the case." 779 A.2d at 345 (quoting *Symington*, 195 F.3d at 1087). We derived that exacting standard from several federal circuit courts of appeals cases, principally *United States v. (Warren) Brown*, 823 F.2d 591, 596-97 (D.C. Cir. 1987), *United States v. Thomas*, 116 F.3d 606, 621-22 (2d Cir. 1997), and *Symington*, 195 F.3d at 1087. *See Shotikare*, 779 A.2d at 344-45 (citing all three cases as support for this standard and discussing them throughout). Because each of those cases provides some helpful backdrop for our *Shotikare* standard, we provide a recap of their relevant holdings.

The first in the trio is the D.C. Circuit's opinion in *(Warren) Brown*. (*Warren*) *Brown* involved a thirteen-week trial, and after five weeks of deliberations, one of the jurors sent a note saying, "I Bernard Spriggs, am not able to discharge my duties as a member of this jury." 823 F.2d at 593-94. Upon questioning, Spriggs indicated that he "disagree[d] with the law" that the defendants were charged under and would not follow the court's instructions because of how that law is "written and the way the evidence has been presented." *Id.* at 594. He further said that, "[i]f the evidence was presented in a fashion in which the law is written, then, maybe, I would be able

to discharge my duties." *Id.* The court dismissed the juror after that colloquy "on the ground that Spriggs would not follow the law and thus could not discharge his duty as a juror." *Id.* at 595.

The D.C. Circuit reversed. Despite the juror's clear statement that he was not able to discharge his duties, and his expressed disagreement with the law the defendants were charged under, the court concluded there was a "possibility that juror Spriggs requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction." *Id.* at 596. Importantly, as *(Warren) Brown* makes clear, when examining whether there is a possibility that the impetus for dismissal was rooted in the juror's views of the case, the cases are concerned not with the judge's motivations for dismissing the juror. They are instead concerned with whether the reports that led to the juror's dismissal possibly stemmed from some disagreement on the merits. Sometimes, as in *(Warren) Brown*, the reports come from a juror who is himself seeking to be removed, so the inquiry is about whether that juror is seeking to be removed because of his dissenting views about the case and an attendant desire to put an end to his apparent stalemate with fellow jurors. *Id.* at 594. More commonly, as in the next two cases discussed, the complaints come from fellow jurors, and the question becomes whether their complaints about their fellow juror stemmed from a disagreement on the merits. *See, e.g.*, *Symington*, 195 F.3d at 1088 (examining whether "the other jurors' frustrations

with" the removed juror stemmed "from the fact that she held a position opposite to theirs on the merits of the case").

The Second Circuit confronted the latter scenario in *Thomas*. *Thomas* concerned a series of complaints about "Juror No. 5" on the second and third days of deliberations. 116 F.3d at 609-11. On the second day of deliberations, one juror indicated in a note that "each time a vote was taken, [Juror No. 5] voted not guilty and had indicated verbally that he would not change his mind." *Id.* at 611. The next day, another juror reported that Juror No. 5 had a "predisposed disposition" that led to the jury being unable to reach a verdict. *Id.* The court then interviewed each of the jurors on that third day of deliberations, and "at least five of the jurors indicated that Juror No. 5 was unyieldingly in favor of acquittal for all of the defendants." *Id.* The court dismissed Juror No. 5—"the only black juror in a case involving black defendants"—concluding based on those interviews that he "was ignoring the evidence in favor of his own, preconceived ideas about the case" and essentially engaged in "nullification." *Id.* at 609, 612. More specifically, the court found that he would not "convict [the defendants] no matter what the evidence was," opining that his views were based on "preconceived, fixed, cultural, economic, or social reasons that are totally improper and impermissible." *Id.* at 612.

The Second Circuit reversed. While the court agreed that a juror who "intends to nullify the applicable law" can be properly dismissed, *id.* at 614, it stressed that trial courts frequently "have no means of investigating the allegation" of juror nullification "without unduly breaching the secrecy of deliberations," *id.* at 621. And "to determine whether a juror is bent on defiant disregard of the applicable law, the court would generally need to intrude into the juror's thought processes," something which the court "may not delve deeply into." *Id.* (quoting *(Warren) Brown*, 823 F.2d at 596). That leaves the court with precious "little evidence" to distinguish "between the juror who favors acquittal because he is purposefully disregarding the court's instructions on the law, and the juror who is simply unpersuaded by the Government's evidence." *Id.* The Second Circuit concluded that it was "required to vacate these judgments because the court dismissed Juror No. 5 largely on the ground that the juror was acting in purposeful disregard of the court's instructions on the law, when the record evidence raises a possibility that the juror was simply unpersuaded by the Government's case against the defendants." *Id.* at 624.

The third case is the Ninth Circuit's opinion in *Symington*—arising from a prosecution of former Arizona Governor Fife Symington—which echoed the same principles and reached the same result as *(Warren) Brown* and *Thomas*. *Symington* involved a juror who was dismissed on the eighth day of deliberations after her fellow jurors first reported she "stated [her] opinion prior to review of all counts"

and later reported that she was not "properly participat[ing] in the discussion with us," listing as reasons that juror's "[r]efusal to discuss views with other jurors," her "[i]nability to maintain a focus on the subject of discussion," and her "[i]nability to recall topics under discussion," among other things. 195 F.3d at 1083. The court separately questioned each of the subject juror's fellow jurors about their note, and "[t]hey all stated that [the juror in question] appeared confused and unfocused during deliberations." *Id.* The court also spoke with the juror in question, who explained that she "can't agree with the majority all the time," and that she "became intimidated when everyone talked at once and demanded that she justify her views." *Id.* at 1084. The trial court dismissed that juror, opining that she was "either unwilling or unable to deliberate." *Id.*

The Ninth Circuit reversed and articulated the "reasonable possibility" standard that this court later adopted in *Shotikare*.[2] *Id.* at 1087-88 & n.5. The Ninth Circuit recognized the "special challenges" a trial court faces when determining whether an issue among jurors "stems from disagreement on the merits of the case." *Id.* at 1086. Trial courts are rather hamstrung in investigating whether juror

---

[2] The D.C. and Second Circuits articulated a slightly different standard, holding that dismissal was inappropriate if there was "*any* possibility that the request to discharge stems from the juror's view" on the merits of the case. *(Warren) Brown*, 823 F.2d at 596 (emphasis added); *Thomas*, 116 F.3d at 621-22. This court followed *Symington*'s lead in clarifying that the possibility needs to be a reasonable one.

complaints stem from disagreements on the merits because any inquiry into the content of the jury's discussions will generally impinge on the secrecy of those deliberations. *See id.* ("[A] court may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations." (quoting *(Warren) Brown*, 823 F.2d at 596)). And without a full investigation, the court runs a substantial risk of dismissing a holdout juror who has prompted complaints because they have simply become a thorn in their fellow jurors' sides or gone quiet from being browbeaten, which would violate the defendant's constitutional right to a unanimous verdict. *Id.* at 1086-87 ("[W]here a request for juror dismissal focuses on the quality of the juror's thoughts about the case and her ability to communicate those thoughts to the rest of the jury, 'the court will likely prove unable to establish conclusively the reasons underlying' the request for dismissal." (quoting *(Warren) Brown*, 823 F.2d at 596)). So while the Ninth Circuit acknowledged that, of necessity, the record was unclear as to what animated the complaints with the ultimately removed juror, there was a reasonable possibility "that the other jurors' frustrations with her derived primarily from the fact that she held a position opposite to theirs on the merits of the case." *Id.* at 1088.

With those three cases as a backdrop, we now turn back to *Shotikare*. *Shotikare* relied extensively on each of those cases and recognized that, as a baseline, there can "be no inquiry into the juror's views on the merits of the case" because

"[j]ury deliberations are presumptively secret." 779 A.2d at 344; *see also Thomas*, 116 F.3d at 623 (courts must choose "to protect deliberative secrecy at the risk of leaving some juror misconduct beyond the court's power to remedy"). Given that presumptive secrecy, and to avoid subtly influencing the jury, a trial judge must proceed "with caution, tact, and respect for the prerogatives of the jury." *Shotikare*, 779 A.2d at 345. The judge "may not delve deeply into a juror's motivations," and certain topics are categorically off limits, such as the "jurors' views of the case, the back and forth among them concerning the evidence or the application of the law to the facts, [and] their numerical division on the merits." *Id.* (quoting *(Warren) Brown*, 823 F.2d at 596).

*Shotikare* recognized that, as a result of those limitations, the record would typically be "less than exhaustive" and the true "reasons for the disruption of deliberations may be less than clear." *Id.* But given the paramount importance of secrecy and unanimity in the deliberative process, we adopted the presumption that a trial judge cannot dismiss a juror if there is "any *reasonable* possibility" that the complaints about the juror leading to dismissal stemmed from their substantive views about the case. *See id.* If such a possibility exists, the judge "must either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement." *Id.* (quoting *(Warren) Brown*, 823 F.2d at 596).

*B. Precedents since* Shotikare *and the federal cases that animated it*

Several of our precedents have since applied the *Shotikare* standard when analyzing the dismissal of a deliberating juror. *See (Thalia) Brown v. United States*, 818 A.2d 179 (D.C. 2003); *Braxton v. United States*, 852 A.2d 941 (D.C. 2004); *Israel v. United States*, 109 A.3d 594 (D.C. 2014); *Pitt v. United States*, 220 A.3d 951 (D.C. 2019). Those cases have identified two scenarios in which a trial court can properly dismiss a deliberating juror in a criminal trial without unduly piercing the substance of the jury's deliberations and still respecting the defendant's right to a unanimous jury. The first, and more common of the two scenarios is (1) when there was an identifiable extrinsic circumstance, unrelated to the substance of deliberations, that animates the juror's dismissal. The second, and more unusual scenario is (2) when the juror had entered deliberations with a closed mind, and was effectively engaged in juror nullification. We expand on each scenario in turn, and then explain why (3) a juror who initially participates in deliberations and later disengages generally cannot be dismissed unless the trial court is firmly convinced that there is no reasonable possibility that such disengagement stems from juror disagreements about the merits of the case.

### 1. Circumstances extrinsic to the deliberations as a ground for dismissal

The more typical scenario where a trial judge can properly dismiss a deliberating juror is when some identifiable extrinsic circumstance detached from the substance of deliberations and wholly divorced from the jurors' views of the case renders the juror unavailable or unfit to continue. That is, if the judge can identify, without unduly intruding into the deliberative process, that something totally separate from the jurors' views about the merits of the case is preventing a juror from deliberating, that juror can be dismissed. *See Symington*, 195 F.3d at 1087 n.6 (explaining, for example, that questions of juror bias generally focus on an "event" or "relationship between a juror and a party" that is "easily identifiable and subject to investigation and findings without intrusion into the deliberative process" (quoting *Thomas*, 116 F.3d at 621)); *see also United States v. Kemp*, 500 F.3d 257, 303 & n.25 (3d Cir. 2007) ("reasonable possibility" rule does not apply if an investigation into juror bias can focus on "a particular act that [gave] rise to the bias" without "implicat[ing] the secrecy of jury deliberations").

In *Pitt*, for example, we upheld the dismissal of a juror on the second day of deliberations because an "observable illness" rendered the juror "'unable to perform' her sworn 'duties.'" 220 A.3d at 970-72 (quoting Super. Ct. Crim. R. 24(c)(1)). The juror there reported to the trial judge that she was "not well at all," and after

questioning her, the judge confirmed that she "didn't look" or "sound well." *Id.* at 969. We found the trial judge had "developed an appropriate basis for determining that [the juror's] request to be released was in fact due to her observed illness" by "interviewing her, inquiring about her condition, and asking whether the court could make accommodations" before dismissing her. *Id.* at 970-71.

It is easy to imagine other circumstances where a juror cannot perform their duties because of something entirely separate from the deliberative process. Among the more routine reasons are a juror's serious financial hardship,[3] an illness in their family that requires personal attention, inflexible travel plans, and the like. *See Shotikare*, 779 A.2d at 345 n.15 (discussing cases "where the juror is incapacitated by illness or trauma or other circumstances beyond her control," has had a "death in her family or comparable shock," or is biased due to a "relationship with a party or witness"); *Thomas*, 116 F.3d at 613 (citing cases involving a business trip, illness, car accident, serious emotional distress, and observance of a religious holiday).

Then there are the aberrant circumstances where a juror engages in blatant misconduct during deliberations separate and apart from their views about the case. We encountered this in *Shotikare* itself, where a juror sent a note on the first day of

---

[3] While Juror 15 purported to be experiencing financial hardship on the fifth day of deliberations, recall that the trial court discredited him about that, and the next day Juror 15 reported that his finances were not affecting his ability to deliberate.

deliberations reporting that "she had been subjected to 'verbal and physical abuse,'" and felt that her "life has been threatened" by another juror. 779 A.2d at 340. Within hours of that note, before the court could respond to or investigate it, the jury sent two more notes saying it was "deadlocked" and that some "jurors have stopped listening, paying attention or participating [in] any way in the deliberations." *Id.* at 340-41. Upon investigation, the offending juror admitted that she had "threatened" to "bite" another juror, and "[t]hings almost came to a fight" in the jury room before she again threatened to "beat" the other juror's "butt" if she did not "leave [her] alone." *Id.* at 342. The other jurors indicated that the offending juror had threatened "to throw [another juror] up against the wall," and "basically" said "'I'll beat the hell out of you,'" which required the two jurors to be physically separated. *Id.* at 341-42 & n.8. While the foreperson said the altercation had "nothing to do with the case" and was "unprovoked," another juror was more equivocal, saying that it stemmed from a "disagree[ment]" that the offending juror took "personally," without indicating whether that disagreement was about the case.[4] *Id.* at 341-42 & n.9.

---

[4] We do not doubt that a violent and threatening deliberating juror might properly be dismissed even if, in some sense, their violent outbursts in the jury room were prompted by disagreements about the case. Such egregious juror misconduct is attenuated enough from the merits of the case that the misconduct itself, rather than the underlying disagreement about the merits, can be properly viewed as the source of the fellow jurors' complaints about them and thus the impetus for their

We upheld the dismissal of the threatening juror. We did so because the clear impetus for the other jurors' complaints, and the grounds for the offending juror's removal, were her threatening words and conduct rather than her "position on the merits or refusal to align with the majority." *See id.* at 345-46. The trial court's "careful and fair inquiry" in *Shotikare* revealed that the sole impetus for the juror's dismissal was her threatening words and conduct, so there was no "reasonable possibility" that it stemmed from that juror's view on the merits. *Shotikare*, 779 A.2d at 340, 345-46.

2. A juror's closed mind at the outset of deliberations as a ground for dismissal

Next are cases that are closer cousins to this one, where a juror has refused to deliberate, albeit from the outset of deliberations. The juror who refuses to deliberate from the outset has engaged in misconduct and defied the court's instructions in a way that is unrelated to their views about the merits of the case, which is what justifies their dismissal. *See (Thalia) Brown*, 818 A.2d at 184; *Israel*, 109 A.3d at 612-13. And that misconduct cannot be traced back to any disagreement with fellow

---

dismissal. *See United States v. Litwin*, 972 F.3d 1155, 1169 (9th Cir. 2020) ("Blatant juror misconduct"—such as a violent threat toward another juror, removing case-related notes from the jury room, or lying to the court about ex parte contacts—can "plainly justif[y] dismissing a juror.").

jurors on the merits of the case, given that it arose at the outset of deliberations, before such views could be expressed or solidified.

In *(Thalia) Brown*, for instance, the jury sent a note less than two hours after deliberations began indicating it could not reach a verdict as to one of the defendants "for reasons unrelated to debate about the evidence," and some minutes after the judge instructed them to continue deliberating, they sent a second note describing the issue as one "of juror nullification." 818 A.2d at 181. After another instruction and two more notes, one of which was from the subject juror, the judge interviewed every juror on the panel and "credited the broad consensus" among them that the subject juror "had refused to participate in the deliberation process *from the beginning*," as a "political statement," so that dismissal was warranted. *Id.* at 183-84, 186-87 & n.6 (emphasis added).

We reached the same result in *Israel*, where within the first "few hours" of deliberations the jury sent a note indicating that one juror's "mind is closed." 109 A.3d at 608, 614 n.33. All other jurors agreed, upon being interviewed, that the juror "*went into* deliberations with a closed mind" and was "unwilling to consider the views of others." *Id.* at 608-10 (emphasis added). The judge then dismissed the juror, crediting the consensus view that "her mind . . . was closed before they started" and

"before they even began talking about the case," such that she "entered the deliberations with a closed mind." *Id.* at 610.

Like *(Thalia) Brown*, *Israel* identified the timing of the juror's reported unwillingness to deliberate as a critical factor in upholding the juror's dismissal. When evaluating whether it was reasonably possible that the juror was "removed because she was a dissenting voice or because of her views on the evidence," we "deem[ed] it important" that the report "came to light early after the case had gone to the jury, when there were still what the foreperson described as 'lots' of disagreements among the jurors." *Id.* at 614. This timing was important because, as we opined, "no juror could be identified as a dissenter" so early in the deliberations, before there was any reason to think the jurors had solidified or even expressed clear views. *Id.* We rejected the appellant's reliance on the Ninth Circuit's opinion in *Symington*, discussed above, because "the jury note [in *Symington*] was sent when the jury had been deliberating for a week," whereas in *Israel*, "the jury had had the case for only a few hours." *Id.* at 614 n.33. We further found it "[n]otabl[e]" that, "following the replacement" of the juror in question, "deliberations continued for a further three days before the jury reached its verdicts, suggesting that there remained much room for discussion at the time" the juror was removed. *Id.* at 614. The trial judge in *Israel* also appreciated the importance of timing in the *Shotikare* analysis, noting—in language relevant here—that he would not have dismissed the juror if

"we were in the fifth day of deliberations, and [the jury] had thoroughly discussed the case." *Id.* at 610.

These cases underscore that, if the jury has just begun deliberations, a juror's unwillingness to participate in deliberations from the outset can be properly viewed as misconduct that is detached from their views about the merits of the case, and that misconduct might warrant their dismissal. In that circumstance, there is no reasonable possibility that the juror had gone quiet due to their disagreement with fellow jurors because deliberations had only just begun, so that the juror had not yet even had an opportunity to assess those opposing views or how rigid they may be. *See United States v. Christensen*, 828 F.3d 763, 811 (9th Cir. 2015) (finding it "highly unlikely" that a juror's reported unwillingness to follow the law was motivated by a disagreement on the merits because the jury note came one hour after deliberations began, which is "unlikely to have been enough time for the jurors to have ascertained such a difference in their views on the evidence"); *see also Braxton*, 852 A.2d at 946-49 ("reluctan[tly]" upholding dismissal of a juror who indicated a bias against police officers in the early hours of the first day of deliberations).[5]

---

[5] That is not to say a trial court can dismiss a juror any time they refuse to deliberate in the early hours of deliberations. *United States v. Litwin*, discussed more below, involved a juror who stated just three hours into deliberations that "no matter

But as the deliberations become more extended, it becomes all the more critical for the court to entertain the possibility that reports of a juror's unwillingness to deliberate stem from some entrenched disagreement on the merits. While this court has never previously confronted the dismissal of a juror who had stopped deliberating only after several days of deliberations, many other courts have confronted that scenario, and we turn to those cases now.

## 3. A juror who disengages after days of deliberations typically cannot be dismissed

There is a striking and important difference between a juror who refuses to engage in deliberations from their outset and one who has simply been so worn down by extended deliberations that they disengage from them. While the first juror could be seen as engaged in misconduct by defying the court's instructions, the second juror is likely not engaged in misconduct at all. And even if they were, it is very hard to discount the possibility that the latter juror's disengagement stemmed from their views about the merits of the case and the protracted deliberations themselves, so that *Shotikare* bars their dismissal regardless of whether that is properly categorized

---

what, she will not change her mind." 972 F.3d at 1174. The Ninth Circuit found her dismissal was improper because there remained "a reasonable possibility" that this juror's "views on the merits of the case" are what prompted two fellow jurors' complaints. *Id.*; *see also id.* at 1177 (noting that *Christensen* "did not create a bright-line rule allowing jurors to be dismissed so long as the jury had only been deliberating a short time").

as misconduct. The federal cases discussed above—*Symington*, *(Warren) Brown*, and *Thomas*—all illustrate that point. We now discuss several more recent cases from both state and federal courts that have specifically highlighted the difference between a juror who refuses to engage from the outset of deliberations and one who disengages only after substantial deliberations have taken place. Importantly, we have not found any case where an appellate court has approved of a juror's dismissal based on a mere refusal to continue deliberating several days into the deliberations, and the government has not pointed us to any such case either.[6]

The Georgia Supreme Court has captured the important difference between a juror who refuses to deliberate from the outset and one who later disengages in a trio of cases: *Jones v. State*, 875 S.E.2d 737 (Ga. 2022); *Delgado v. State*, 848 S.E.2d 665 (Ga. 2020); and *Mason v. State*, 535 S.E.2d 497 (Ga. 2000). In *Jones*, the court did not dispute the trial court's findings that "as early as two hours into deliberations," one of the jurors had "declined to deliberate further." 875 S.E.2d at

---

[6] The only possible candidate we have found is *United States v. Abbell*, 271 F.3d 1286 (11th Cir. 2001). The *Abbell* opinion never specifies how long the jury had deliberated before one juror was removed, but the opinion is clear that "*early in the process*" the juror in question "made comments that she did not have to follow the law," "was not going to follow the law," "and that the court's instructions were only advisory and not binding on the jury." *Id.* at 1303 & n.18 (emphasis added). While it is not entirely clear what the court meant by "early in the process," that would not seem like a fair description of somebody whose recalcitrance arose only after days of deliberations.

747. But that was no basis for dismissing that juror, the court reasoned, as it appeared that the juror had simply "reached a firm conclusion as to the counts before the jury and declined to deliberate further." *Id.* The court explained that the law "does not require a juror who has properly reached a fixed opinion as to guilt or innocence to continue to deliberate indefinitely in order to fulfill the juror's duty." *Id.* at 749. "At some point a juror who has reached and communicated a firm conclusion as to guilt or innocence may stop engaging with other jurors in deliberations," seeing as how "[m]ost people lack the fortitude to debate an issue with strangers indefinitely." *Id.* As the court concluded, "that does not mean that they are 'unable to perform their duty'" as a juror. *Id.* (citing Ga. Code Ann. § 15-12-172).

*Jones* echoed what the Georgia Supreme Court had said earlier in *Delgado* and *Mason*. *Delgado* held that the court abused its discretion when removing a juror who participated in deliberations for five hours before making up his mind and disengaging from further deliberations. *See* 848 S.E.2d at 669. *Delgado* explained that the "holdout juror . . . did not fail to fulfill his obligations as a juror, but rather had reached a decision, which was based on his review of the testimony and the witnesses' credibility, after meaningfully deliberating and trying to reach a verdict," and simply thought "the deliberations were no longer productive." *Id.* at 670. *Mason* reached the same conclusion where the trial court removed a juror who self-reported on the third day of deliberations "that she did not want to deliberate further and

would not change her vote." 535 S.E.2d at 498, 500. The court explained that the juror's disengagement "did not amount to a refusal to deliberate," because it came "only after she and the other jurors had already deliberated for more than two days." *Id.* at 500.

The California Supreme Court has likewise articulated the above distinction, explaining that a "juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." *People v. Cleveland*, 21 P.3d 1225, 1238 (Cal. 2001). In *Cleveland*, the jury sent a note on the second day of deliberations indicating that one juror "does not show a willingness to apply the law." *Id.* at 1227-28. When asked whether the juror in question had made up his mind prior to deliberations and was refusing to discuss the case, the foreperson responded: "I don't know if I could say that their mind was made up before we went into the room." *Id.* at 1228. He continued that the juror would only "[h]alfheartedly" listen to other jurors, refused to discuss the elements of the offense, and had told other jurors: "You're not going to sway my mind." *Id.* The trial court then polled the jurors about whether any of them felt "that any other juror or jurors . . . are not deliberating." *Id.* Ten of the eleven jurors, discounting the one in question, answered in the affirmative. *Id.* The trial judge dismissed the subject juror, and the California Supreme Court overturned the defendant's convictions. It

explained that the record showed that the juror in question had engaged in deliberations, and "it was the conclusion arrived at by [that juror] that was" the issue that prompted his fellow jurors' complaints.[7] *Id.* at 1238; *see also People v. McGhee*, 565 P.3d 963, 976 (Cal. 2025) (reversing dismissal of juror who had deliberated "for the better part of three court days" before jurors complained that he was not participating).

Also consider the Ninth Circuit's recent application of *Symington* in *United States v. Litwin*, 972 F.3d 1155 (9th Cir. 2020). Just three hours into deliberations following a ten-week trial, the jury in *Litwin* sent a note stating: "Jury cannot come to a decision. We have a jur[or] that says no matter what, she will not change her mind." *Id.* at 1162. Upon questioning, the juror herself acknowledged that she had told her fellow jurors "[t]wo to three times" that her mind was made up and she "would not change" it. *Id.* at 1165-66. The trial court dismissed the juror, reasoning that further deliberations would be "a waste of time" given the juror's announcement

---

[7] *Cleveland* discussed *Symington*, *(Warren) Brown*, and *Thomas* at some length, and agreed with those cases on several core principles, but expressly departed from them about others. 21 P.3d at 1236-37. For example, *Cleveland* did not share the federal circuit courts' aversion to probing jury inquiries, and the court reiterated its own prior precedent that permits a trial judge to make "whatever inquiry is reasonably necessary to determine" whether a juror should be removed. *Id.* at 1237. It also did not adopt the "any reasonable possibility" standard articulated in *Symington* and later adopted by this court. *Id.*

"from the get-go" that her mind was made up. *Id.* at 1166-67. The Ninth Circuit vacated the resulting convictions. The court acknowledged two fellow jurors' reports that the removed juror "would not engage in the deliberative process," *id.* at 1174, but explained after extensively reviewing the record that the juror in question had in fact been deliberating, *id.* at 1175-76. While the juror's recent disengagement might be seen by some as a refusal to deliberate, the court posed a powerful rhetorical counter to that instinct: "If a juror has reached a decision, at what point is potential unwillingness to alter that position a failure to deliberate as opposed to a reflection of the juror's sincerely held view of the evidence presented?" *Id.* at 1170. The jury's own note indicated that the problems with the subject juror stemmed from "a disagreement about the case itself," as it indicated up front that the juror "cannot come to a decision." *Id.* at 1175.

While we doubt that a juror who has stopped deliberating only after days or weeks of engagement can fairly be described as committing misconduct, that is ultimately beside the point. Either way, after such a substantial period, a trial court must be especially attuned to the heightened possibility that such disengagement "stems from the juror's views on the merits of the case," *Shotikare*, 779 A.2d at 345,

and the court cannot dismiss that juror unless it is firmly convinced that any issue with them is unrelated to their views about the merits of the case.[8]

## C. Applying the precedents to this case

We now turn to the present case and review the trial court's decision to replace Juror 15 on the sixth day of deliberations for an abuse of discretion.[9] Jordan mounts two challenges related to Juror 15's dismissal, arguing that: (1) the trial judge failed to recognize her discretion and did not apply the *Shotikare* standard; and (2) the

---

[8] That is not to say that the complaining jurors are necessarily acting in bad faith when reporting that a fellow juror is not deliberating. That is certainly one possibility—a juror in the majority can easily dress up a disagreement on the merits as a complaint about a holdout juror's general refusal to deliberate in order to break an apparent deadlock. *See Litwin*, 972 F.3d at 1170 ("[D]isagreements on the merits can 'certainly manifest themselves in concerns about a juror's reasonableness or general capacity as a juror.'" (quoting *Symington*, 195 F.3d at 1088)). But we suspect the more common scenario is that the jurors in the majority sincerely believe that the dug in and/or disengaged holdout juror is abdicating their duty to deliberate. *See Abbell*, 271 F.3d at 1302 ("A risk exists . . . that ten or eleven members of a jury that have collectively reached agreement on a case's outcome may thereafter collectively agree that the one or two hold-outs—instead of honestly disagreeing about the merits—are actually refusing to apply the law as instructed by the court in an impermissible attempt to nullify the verdict.").

[9] We disagree with the government's suggestion that we should review this claim for plain error because it was not adequately preserved. Defense counsel clearly and persistently objected to Juror 15's removal, cogently explaining that it was not clear whether he had "a closed mind or a dissenting mind," adding that "if it is a dissenting mind, then according to case law he may not be excused," and further positing that it appeared "everybody else is picking on him because they're getting pissed off" that he disagrees with them. The present claim was more than adequately preserved.

record reveals at least a reasonable possibility that the impetus for Juror 15's dismissal was his view on the merits of the case.

We summarily reject his first argument—the trial judge carefully approached this issue and showed great respect for the dual interests of protecting the secrecy of jury deliberations while protecting Jordan's right to a unanimous jury. We do not think her failure to specifically recite *Shotikare* or the "reasonable possibility" standard verbatim is any indication that she did not apply its principles. *See Hobbs v. United States*, 18 A.3d 796, 800 (D.C. 2011) (trial court need not recite a precise rule or standard "so long as it 'was scrutinizing whether [the juror] had the capacity to continue to serve as a juror'" (quoting *Hinton v. United States*, 979 A.2d 663, 684 (D.C. 2009))). And we do not think the judge's inartful phrasing—"under the rules . . . I've got no choice but to remove him"[10]—meant that she failed to appreciate that she had discretion in the matter. The trial judge was clear enough that she

---

[10] This appears to be a reference to Super. Ct. Crim. R. 24(c)(1) ("The court *may* . . . replace any jurors who are unable to perform or who are disqualified from performing their duties.") (emphasis added); *see also* Super. Ct. Crim. R. 23(b)(3) ("After the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict . . . if, due to extraordinary circumstances, the court finds it necessary to excuse a juror for just cause."); *cf. Abney v. United States*, 273 A.3d 852, 860 (D.C. 2022) (declining to "express a view about the precise nature of the difference, if any, between" the standards in Rule 24(c) and Rule 23(b)).

understood, in her words, that she could not dismiss Juror 15 because he has "an opinion that's different from his colleagues."

We need not dwell on that first point further because, while we find the trial judge proceeded with "caution, tact, and respect for the prerogatives of the jury," *Shotikare*, 779 A.2d at 345, we agree with Jordan on his second point—that Juror 15 could not properly be dismissed in any event. That is to say, there was a reasonable possibility that the other jurors' complaints about him arose from his views on the merits, as did his own stated unwillingness to participate in deliberations further.

Notably, this case does not present either of the two scenarios discussed above, in which a deliberating juror might be properly dismissed: (1) there was no extrinsic circumstance unrelated to the substance of deliberations that animated his dismissal; and (2) there was no evidence that Juror 15 had a closed mind or refused to discuss the case at the outset of deliberations. So that raises the question of whether (3) there are some facts in this case that could firmly convince us that Juror 15's ouster had nothing to do with his views on the merits of the case. We address those three points in turn.

First, there was no extrinsic circumstance, like the illness in *Pitt* or the threats in *Shotikare*, that animated Juror 15's dismissal. The only thing even remotely along those lines was the reference in Juror 13's note to Juror 15's "emotional duress"—

appearing to mean "distress"—after learning the jury's verdict must be unanimous. *See United States v. Laffitte*, 121 F.4th 472, 490 (4th Cir. 2024) ("The removal of a juror whose emotions render her incapacitated may be an adequate exercise of the district court's discretion."). Juror 15 did not report any such emotional distress himself, however, and the trial court did not dismiss him on account of any perceived distress. In any event, Juror 13 went on to describe the source of Juror 15's distress as the "perceived burden of a[] unanimous decision," which can reasonably be interpreted as referencing Juror 15's unwillingness to go along with a guilty verdict. *See id.* ("But such emotional distress only justifies removal if it bears no causal link to the juror's holdout status."). And although financial hardship can be a valid basis to dismiss a juror, *see Hinton*, 979 A.2d at 680, the judge discredited Juror 15's claim to be experiencing financial hardship and refused to dismiss him for that reason.

Second, there was no evidence or report of Juror 15 refusing to deliberate from the outset of deliberations; the first report of any disengagement did not come until the sixth day of deliberations. It was only at that point that Juror 28 complained about Juror 15's "clear lack of willingness to participate in juror responsibilities," and Juror 13 reported his "averseness to participating in the process due to emotional duress [and] perceived burden of a[] unanimous decision." There was no indication that Juror 15 had refused to participate in the week of deliberations preceding these reports—aside from a report that he was occasionally "playing on [his] phone"—

and thus nothing to cast doubt on Juror 15's account that he had been "an active participant in the deliberations" up until his fellow jurors' complaints. *Cf. (Thalia) Brown*, 818 A.2d at 187 (complaints from the outset of deliberations); *Israel*, 109 A.3d at 608-10 (same).

Third, because neither of those two scenarios existed here, we must turn to the rest of the record to discern whether there is some reasonable possibility that the complaints with Juror 15, and thus his ultimate dismissal, stemmed from his views about the case. This standard is similar to the beyond a reasonable doubt standard— we must be "firmly convinced" that the impetus for Juror 15's dismissal was unrelated to his position on the merits of the case. *See Symington*, 195 F.3d at 1087 n.5 (analogizing the inquiry to "proof beyond a reasonable doubt"); *Litwin*, 972 F.3d at 1170 ("[T]he available evidence must be 'sufficient to leave one firmly convinced that the impetus for a juror's dismissal is unrelated to his or her position on the merits.'" (quoting *Christensen*, 828 F.3d at 807)); *Kemp*, 500 F.3d at 304 ("[T]he standard is by no means lax: it corresponds with the burden for establishing guilt in a criminal trial."); *see also United States v. (Corrine) Brown*, 996 F.3d 1171, 1184 (11th Cir. 2021) (describing the analogous "substantial possibility" standard as "basically a 'beyond a reasonable doubt' standard" (quoting *Abbell*, 271 F.3d at 1302)).

A close analysis of the record, which includes several hints that Juror 15 was quite possibly singled out because he would not go along with an otherwise unanimous guilty verdict, makes it evident that there was a reasonable possibility that Juror 15's dismissal stemmed from his views on the case.

The most telling evidence of that was Juror 15's response to the trial judge's question about whether he could continue deliberating on day six. The government understandably stresses his first response—"I'm going to say no"—but far more revealing is his explanation: "I get my own little idea that I hold onto and I think *I'm going to hold onto it.*" (emphasis added). We struggle to see how this could be interpreted as anything other than Juror 15 indicating that he had reached a decision at odds with his fellow jurors' views and did not think further deliberations would be fruitful. The government remarks that Jordan "did not request further questioning to clarify" what Juror 15 meant by that, but no further questioning was required or even appropriate to understand the import of that statement. Juror 15 explained to the trial court that it would be "hard" to say more without delving into what he and his "fellow jurors are talking about," at which point the trial court rightly cut him off because it was clear that further inquiry would intrude into the substance of jury

deliberations. This statement alone seems to raise a strong possibility that the fellow jurors' complaints about Juror 15 stemmed from his views on the merits.[11]

Several more subtle clues further support the reasonable possibility that it was Juror 15's views on the merits of the case that led to his fellow jurors' complaints about him. For one, the juror note on day five asking if the jury could consider the manslaughter charge suggested that the jury did not think it was futile to discuss that lesser charge—i.e., the jurors did not appear to view Juror 15 as broadly recalcitrant in his duties—only that they appeared to be at an impasse on the greater second-degree murder charge. Another clue comes from Juror 13's note on the sixth day, in which she reported that Juror 15 was "not comfortable making judgements *against* others." (emphasis added). Juror 13's note, both on its face and especially given that background of the note the previous day asking if jurors could move on to considering the manslaughter charge, pretty clearly suggests that Juror 15 was a holdout for acquittal and that at least Juror 13 had grown tired of it.

---

[11] That possibility, which was palpable before Juror 15's dismissal, was ultimately further evidenced by the jury's prompt return of unanimous guilty verdicts once Juror 15 was removed. *Cf. Israel*, 109 A.3d at 614 (highlighting as support for its conclusion that a juror's removal did not stem from any disagreement on the merits the fact that, "following the replacement of [the juror], deliberations continued for a further three days before the jury reached its verdicts, suggesting that there remained much room for discussion at the time [the juror] was removed").

In responding to Juror 13's note, the trial court somewhat more neutrally asked whether Juror 15 had "any issue passing judgment"—dropping the "against" from Juror 13's note—and Juror 15 responded that he did. But there is ambiguity in that question and answer. We do not understand Juror 15's response to clearly mean that he could not reach *any* decision.[12] The judge did not ask him that. Having an issue "passing judgment" instead could just as readily be understood as Juror 15 saying that he had an issue with casting a guilty vote, perhaps because he did not think the government proved Jordan's guilt beyond a reasonable doubt. After all, in ordinary usage, to "pass judgment" on another usually means to condemn or be critical of them in some way. *See* Collins English Dictionary, www.collinsdictionary.com/us/dictionary/english/to-pass-judgment; https://perma.cc/YC6F-3A7P (last visited July 7, 2026) (noting that "to pass

---

[12] Even if we understood his response that way, recall that the trial court had opined that Juror 15 had already engaged in a "total ruse" to try and get himself excused from the jury on the fifth day of deliberations—inventing a financial hardship—at around the same time the jury sent another note suggesting they had reached an impasse on the lead charge. That background makes it difficult to discount the possibility that, now on the sixth day of deliberations, Juror 15 was engaged in a similar ruse in an effort to get himself removed from the jury, which would likewise not justify dismissing him. Such a ruse might, of course, stem from a juror's protracted status as a holdout and a desire to be put out of their misery. *See generally (Warren) Brown*, 823 F.2d at 594 (examining whether a juror's self-reported inability "to discharge [his] duties as a member of this jury" resulted from his status as a holdout juror). Notably, in *Litwin*, the dismissed juror had likewise asked to be removed from the jury due to financial distress prior to her ultimate improper ouster. *Litwin*, 972 F.3d at 1160.

judgment" applies "especially if you are making a criticism"). That's why the colloquialism, "Don't judge me," would be a fitting response to a criticism, but an odd response to a compliment.

And beyond the particular clues in this record, we reiterate that the trial court must be especially mindful that a juror who disengages only after several days of deliberations may be doing so because of some disagreement on the merits of the case. That is simply the most likely culprit for that behavior, and the serious impediments to a trial court investigating the matter, owing to the secrecy of jury deliberations, make it exceedingly difficult for the court to firmly discount that reasonable possibility.

*        *        *

We recognize that the trial judge in this case was faced with a difficult dilemma—torn between her conflicting responsibility to investigate potential juror recalcitrance, her obligation to respect the secrecy of jury deliberations, and her paramount duty not to intrude upon Jordan's right to a unanimous jury verdict. But our cases are clear that, when placed in that difficult spot, first and foremost a trial judge must make sure that she is not removing a juror who has become an issue only because of their views about the merits of the case. When the judge cannot discount that possibility with firm conviction after the limited inquiry they are permitted to

make under *Shotikare*, then further deliberations or a mistrial are the only available options. *See* 779 A.2d at 345. In this instance, we conclude that it is reasonably possible that Juror 15's dismissal stemmed from his dissenting views about the merits of the government's case. The trial judge thus erred by dismissing him.

It is not clear to us whether such an error could ever be harmless. *See generally Litwin*, 972 F.3d at 1178 (considering without resolving whether such errors are "structural," and observing that, after directing supplemental briefing on the topic, "[n]o party has identified a case in which a court has delved into the question whether the improper dismissal of a juror during deliberations is structural error or subject to harmless error review"). In any event, the government does not contend that it was harmless in this case, and we think it was plainly harmful given the reasonable likelihood that Juror 15 was a holdout for acquittal. Jordan is thus entitled to a new trial.[13]

---

[13] Jordan also argues that the trial court erred in admitting certain evidence at his trial. Because we reverse and remand on the juror dismissal issue, and these evidentiary claims are idiosyncratic enough that they seem unlikely to arise on retrial in the same posture, we do not resolve them. *See Abney*, 273 A.3d at 870 (declining to address evidentiary errors where "it was unclear whether, and if so how, [the] issue[s] would arise on remand") (citing *In re J.W.*, 258 A.3d 195, 208 (D.C. 2021)).

## III. Conclusion

For the foregoing reasons, we reverse Jordan's convictions and remand for a new trial.

*So ordered.*